IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

> FILED
>
> MAR 21 2024
>
> CLERK, U.S. DISTRICT COURT
> NORFOLK, VA

**GARY TEDERICK and LISA TEDERICK,**
**individually and on behalf of all others similarly**
**situated,**

        **Plaintiff,**

    **v.**                                   **CIVIL ACTION NO. 2:22-cv-394**

**LOANCARE, LLC,**

        **Defendant.**

## *MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant LoanCare, LLC's Motion to Dismiss the Second Amended Complaint. ECF No. 31. LoanCare moves to dismiss, in its entirety, Plaintiffs Gary and Lisa Tederick's ("the Tedericks") Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Upon review, the Court finds that a hearing on this Motion is unnecessary, and the matter is now ripe for judicial determination. *See* E.D. Va. Local Civ. R. 7(J). For the reasons stated herein, LoanCare's Motion to Dismiss is **GRANTED in part and DENIED in part.** The Motion is **GRANTED** with respect to Count II (Unjust Enrichment) and Count III (Conversion). The Motion is **DENIED** with respect to Count I (WVCCPA Claims).

## I.      FACTUAL AND PROCEDURAL HISTORY

On September 20, 2022, the Tedericks filed a Complaint seeking class action status and alleging that LoanCare violated fair debt collection provisions of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-2-122 *et seq.* ("WVCCPA"), benefited from unjust enrichment, and converted their funds. Compl., ECF No. 1. On January 27, 2023, LoanCare filed

its first motion to dismiss under Rule 12(b)(6) for failure to state a claim and Rule 12(b)(7) for failure to join necessary parties under Rule 19. ECF No. 15. On October 2, 2023, the Court granted LoanCare's Rule 12(b)(6) motion with respect to the Tedericks' fraud-based claims in Count I and their Unjust Enrichment claim in Count II. *See* Order, ECF No. 25 ("Order on First Motion to Dismiss"); *see Tederick v. LoanCare, LLC*, No. 2:22-cv-394, 2023 WL 6465404 (E.D. Va. Oct. 2, 2023). The Court dismissed those claims without prejudice and granted leave to amend. The Court denied LoanCare's Rule 12(b)(6) Motion with respect to the Tedericks' remaining statutory claims in Count I and their conversion claim in Count III. The Court also denied LoanCare's Rule 12(b)(7) motion.

On October 25, 2023, the Tedericks filed a Second Amended Complaint. ECF No. 30 ("SAC"). On November 8, 2023, LoanCare filed the instant Motion to Dismiss under Rule 12(b)(6). ECF No. 31; *see also* ECF No. 32 (Def.'s Mem. Supp.). The Tedericks responded in opposition on November 22, 2023. ECF No. 37 ("Pls.' Resp. Opp'n"). LoanCare replied on December 8, 2023. ECF No. 38 ("Def.'s Reply"). Relevant to LoanCare's Motion and stated in the light most favorable to the Tedericks, the following facts are drawn from the Second Amended Complaint and attachments thereto. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

The Tedericks built their home in 2002 in Hedgesville, West Virginia. SAC ¶ 7. On March 4, 2004, they decided to refinance their home by taking out a loan from Mid-States Financial Group, Inc. using a Note backed by a Deed of Trust and held by the Federal National Mortgage Association ("Fannie Mae"). *Id.* ¶¶ 7–9; SAC Ex. A at 1, ECF No. 30-2 ("Note"); SAC Ex. B, ECF No. 30-3 ("Deed of Trust"). The terms of the loan required the Tedericks to make scheduled monthly payments of $875.36 to the Note Holder beginning May 1, 2004, with any remaining

amounts owed in full on April 1, 2034. Note ¶ 3. Interest was to be "charged on unpaid principal until the full amount of Principal has been paid." *Id.* ¶ 2.

The Note states that "[e]ach monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal." *Id.* ¶ 3. The Tedericks were entitled to "make payments of Principal at any time before they are due. A payment of Principal only is known as a 'Prepayment.'" *Id.* ¶ 4. But the Tedericks "[could] not designate a payment as a Prepayment if [they had] not made all the monthly payments due under the Note," and they had to notify the lender in writing when making a Prepayment. *Id.* Upon receipt of a Prepayment, the Note Holder "will use [the] Prepayments to reduce the amount of Principal" owed. *Id.* The Note Holder is also authorized "to apply [a] Prepayment to the accrued and unpaid interest on the Prepayment amount before applying [the] Prepayment to reduce the Principal amount of the Note." *Id.* The Deed of Trust further specifies that "[v]oluntary prepayments shall be applied first to any prepayment charges and then as described in the Note." Deed of Trust § 2; SAC ¶ 11.

The Tedericks frequently made Prepayments during the life of the loan. SAC ¶ 12. When making payments, the Tedericks often wrote one check containing their monthly payment amount and a Prepayment amount, specifying in the memo line that a Prepayment amount was included in the total. *Id.* ¶ 13. According to the Second Amended Complaint, the loan accrued scheduled interest, meaning the Tedericks did not owe interest on the loan until the scheduled monthly payments were due. SAC ¶ 15.

The Note and Deed of Trust are contained on "Fannie Mae/Freddie Mac UNIFORM INSTRUMENT[S]." *See generally* Note; Deed of Trust. The Fannie Mae Servicing Guidelines ("Guidelines") address the order in which a lender or servicer should apply scheduled monthly payments and Prepayments. SAC ¶ 16. Guideline F-1-09 provides that when a borrower includes

a Prepayment "with the scheduled monthly payment," the loan servicer must "apply the scheduled monthly payment first, then apply the [Prepayment]."[1] *Id.*; SAC Ex. C at 1–2, ECF No. 30-3. In contrast, when the borrower submits a Prepayment at "any other time of the month, separately," the loan servicer must "apply the [Prepayment] first, then apply the next scheduled monthly payment." SAC ¶ 16; SAC Ex. C at 1–2. Guideline C-1.1-01 instructs servicers to "[a]pply scheduled payments, including late charges (if applicable) in the order specified in the security instrument. Note: When multiple payments are received, each payment must be applied separately." SAC Ex. D at 1, ECF No. 30-4; *see* SAC ¶ 17. Finally, Guideline C-1.2.-01 provides that "[t]he servicer must immediately accept and apply an additional principal payment (referred to as a principal curtailment) identified by the borrower as such for a current mortgage loan." SAC ¶ 18; SAC Ex. D at 7. The Tedericks allege these Guidelines mean that when a borrower makes a Prepayment any time before the due date of a scheduled monthly payment, the servicer must immediately apply the Prepayment to the unpaid principal. SAC ¶ 19.

Between 2005 and 2020 the Tedericks made 180 payments containing both a scheduled monthly payment and a Prepayment ("combined payment") before the monthly payment due date. *Id.* ¶ 20. For at least 152 of those payments, a servicer failed to apply the Prepayment and scheduled monthly payment in the correct order. *Id.* ¶ 21. Instead, the servicer applied the scheduled monthly payment, then the Prepayment. *Id.* ¶ 22.

Around April 2019, LoanCare became the subservicer of the Tedericks' mortgage loan and began accepting and applying their loan payments.[2] *Id.* ¶ 24. That month, the Tedericks contacted

---

[1] The Guidelines use the term "curtailment," which the Tedericks equate to "prepayment" in their Second Amended Complaint. *See* SAC Ex. C at 1–2; SAC ¶ 16. As indicated above, Guideline C-1.2.-01 also refers to an "additional principal payment" as a "principal curtailment." SAC Ex. D at 7; *see also* SAC ¶ 18.

[2] LoanCare defines "subservicer" as an "entity to which servicers who either own entire loans or own a loan's master servicing rights ('MSRs') can outsource servicing activities related to a mortgage loan." ECF No. 16 at 5 ("Def.'s First Mem. Supp."); ECF No. 16-1 ¶¶ 2–3 ("First Tharpe Decl."). As a subservicer, LoanCare "accepts receipts of borrowers' payments of principal and interest and funds are passed through

LoanCare to explain that previous servicers misapplied their Prepayments and to request that LoanCare correct their account to accurately reflect the amount of interest owed on the loan. *Id.* ¶ 25. The Tedericks spoke to a Loan Care representative named "Tiffany," who allegedly assured them that the problem was rectified. *Id.* Yet LoanCare made no changes to the account and went on to apply the Tedericks' final sixteen combined payments in the order of the scheduled monthly payment first and the Prepayment second. *Id.* ¶¶ 26–28.

The Tedericks made "repeated attempts to have the misapplications rectified," but LoanCare was not responsive. *Id.* ¶ 31. On or around September 5, 2020, the Tedericks requested a payoff statement from LoanCare, which LoanCare provided on September 14, 2020. *Id.* ¶ 31. On or around September 21, 2020, the Tedericks paid the loan in full. *Id.* ¶ 30. Because LoanCare misapplied their combined payments, the Tedericks claim LoanCare charged them undue interest. *Id.* ¶¶ 23, 30.

The Tedericks assert three main claims against LoanCare: statutory violations involving two fair debt collection provisions of the WVCCPA, W. Va. Code §§ 46A-2-127 and 46A-2-128 (Count I), *id.* ¶¶ 32–48; unjust enrichment (Count II),[3] *id.* ¶¶ 49–55; and conversion (Count III), *id.* ¶¶ 56–60. The Tedericks also allege that the action is brought and may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. *Id.* ¶ 62.

## II.      LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted. For the purposes of a Rule 12(b)(6) motion, courts

---

to . . . investors and LoanCare's clients." First Tharpe Decl. ¶ 4. LoanCare subserviced the Tedericks' loan for client New Residential Mortgage LLC, and Fannie Mae was the investor on the loan. Def.'s First Mem. Supp. at 6; First Tharpe Decl. ¶ 5. The Court provides these assertions of fact from LoanCare's filings to give context to the Tedericks' allegations.
[3] The Tedericks acknowledge that the Court dismissed Count II in its Order partially granting LoanCare's first motion to dismiss on October 2, 2023, but re-plead their unjust enrichment claim to preserve the issue for appeal. SAC at 10 n.1.

may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

Federal Rule of Civil Procedure 8(a)(2) "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554– 55 (2007) (quotation omitted). A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See id.* at 555, 570. This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 556 U.S. 662, 667–79 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertion[s] . . . without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.*

Claims alleging fraud, including constructive fraud, are subject to a heightened pleading requirement. Rule 9(b) requires a party "alleging fraud or mistake" to "state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Mere allegations of fraud by hindsight will not satisfy this heightened pleading requirement, although the rule allows conclusory allegations about a defendant's knowledge of the true facts and a defendant's intent to deceive. *Id.*; *see also Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994). Accordingly, "a plaintiff must allege the identity of the person who made the fraudulent misrepresentation, as well as the time, place, and content of the misrepresentation." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) ("*Harrison I*"). "These facts are often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (citation omitted).

"The particularity requirement serves four purposes: 1) it puts the defendant on notice of the conduct complained of; 2) it protects defendants from frivolous claims; 3) it eliminates fraud actions in which all the facts are learned after discovery; and 4) it protects defendants from harm to their goodwill and reputation." *Hyundai Emigration Corp. v. Empower-Visa, Inc.*, No. 1:09-cv-124 (GBL), 2009 WL 10687964, at *4 (E.D. Va. July 2, 2009) (citing *Harrison I*, 176 F.3d at 784). Where a party fails to plead fraud with particularity, the party fails to state a claim under Rule 12(b)(6). *See Harrison I*, 176 F.3d at 783 n.5. Finally, "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* at 784.

### III.     DISCUSSION

#### A.     Jurisdiction and Applicable Law

The Tedericks allege, and LoanCare does not dispute, facts satisfying the requirements for federal subject matter jurisdiction under 28 U.S.C. § 1332(d). *See* SAC ¶¶ 1–4; *Dart Cherokee*

7

*Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("When a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith."). Because there is no question of federal law in this case, jurisdiction only exists in diversity under § 1332.

The Court has previously held that West Virginia law governs this dispute. *See* Order on First Motion to Dismiss at 10–12. The parties do not dispute that conclusion, and nothing in the Tedericks' Second Amended Complaint changes the Court's prior analysis. Thus, the Court hereby incorporates its prior choice-of-law analysis and concludes again that West Virginia substantive law governs the Tedericks' claims. *Id.*

**B.     Failure to State a Claim**

LoanCare raises three main arguments in its Motion to Dismiss. First, the Tedericks fail to state a claim under all counts because their allegations demonstrate that LoanCare applied their payments exactly as required by the Note and Deed of Trust. Second, the Tedericks do not have a right of action to enforce the Fannie Mae Guidelines, meaning they cannot state a claim based on a Guidelines violation as a matter of law. Third, the Tedericks fail to state a fraud claim in Count I because they do not satisfy the particularized pleading standard of Federal Rule of Civil Procedure 9(b).

**i.      Alleged misapplication of payments**

According to LoanCare, the Tedericks' pleadings demonstrate that LoanCare properly applied their combined payments to their loan, meaning the Tedericks fail to state a claim upon which relief can be granted. Def.'s Mem. Supp. at 8. First, LoanCare argues that because the Note defines "Prepayment" as "a payment of principal only," the Tedericks must submit Prepayments in separate, standalone checks or instruments. *Id.* at 7–9; *see* Note ¶ 4. LoanCare argues that the

Guidelines confirm this interpretation. Def.'s Mem. Supp. at 11–12. Second, LoanCare argues that the "plain and unambiguous" terms of the Deed of Trust required it to apply the full amount of the Tedericks' combined payments pursuant to the "order of priority" for "all payments." *Id.* at 10; Deed of Trust § 2. This order of priority requires all payments to be applied first to the monthly payment amounts of interest and principal, then to various other amounts and charges, and lastly to further reduce the principal balance of the Note. Def.'s Mem. Supp. at 10; *see* Deed of Trust § 2.

The Tedericks contest LoanCare's interpretation of the Note and Deed of Trust. First, they argue that nothing in either instrument requires a Prepayment to be made in a separate check. Pls.' Resp. Opp'n at 16–18. Second, they contend that the Note gives them a "right to make prepayments of Principal at any time before they are due." Pls.' Resp. Opp'n at 15; *see* Note ¶ 4. The Tedericks argue that if a "Prepayment" required a separate instrument, it would force them to submit a monthly payment before they could submit a Prepayment, nullifying their right to make Prepayments "at any time." Pls.' Resp. Opp'n at 15. Third, the Tedericks argue that the Deed of Trust's definition of "Periodic Payment" contemplates that a single instrument may contain multiple "amounts," including a monthly payment amount and a Prepayment amount. *Id.* at 20–21; Deed of Trust ¶ (P).[4]

Finally, the Tedericks argue that whether a Prepayment is made in a combined payment or a separate check does not affect its application to the loan because the Guidelines require the servicer to "immediately accept and apply an additional principal payment." Pls.' Resp. Opp'n at

---

[4] The Tedericks also note that LoanCare failed to raise these contract interpretation defenses in its motion to dismiss the original Complaint, even though it could have raised them at that time. Pls.' Resp. Opp'n at 13–14. While true, LoanCare's defenses are properly considered per Federal Rule of Civil Procedure 12(h)(2). *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Rule 12(h)(2) . . . makes it clear that a litigant need not consolidate all failure-to-state-a-claim arguments in a single dismissal motion."); *Wadi Food Indus. Co. S.A.E. v. Barclays Bank Del.*, No. 2:18-cv-554, 2019 WL 2169209, at *8 (E.D. Va. May 2, 2019), *report and recommendation adopted*, 2019 WL 2163605 (E.D. Va. May 17, 2019).

18, 21; *see* SAC ¶¶ 18–19. LoanCare therefore should have applied the Tedericks' Prepayments immediately toward the principal, rather than waiting until the first of the month. Pls.' Resp. Opp'n at 19–20. LoanCare replies that this is a new theory of harm not pled in the Second Amended Complaint, which alleges that LoanCare applied the Tedericks' Prepayments in the "wrong order," not at the wrong time of the month. *See* Def.'s Reply at 3–4.

> a.   Contract Interpretation under West Virginia Law

Under West Virginia law, courts should interpret contracts according to their ordinary meaning. *See Safeco Ins. Co. of Am. v. Mountaineer Grading Co.*, No. 2:10–cv–01301, 2012 WL 830158, at *4 (S.D. W. Va. Mar. 9, 2012) (citing *Bennett v. Dove*, 166 W. Va. 772, 774 (1981)). "It is not the right or province of a court to alter, pervert or destroy the clear meaning of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." *Dan's Carworld, LLC v. Serian*, 677 S.E.2d 914, 918 (W. Va. 2009) (quoting Syllabus pt. 1, *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395 (W. Va. 2008) (per curiam)). "When a written contract is clear and unambiguous its meaning and legal effect must be determined solely from its contents and it will be given full force and effect according to its plain terms and provisions. Extrinsic evidence of the parties to such contract, or of other persons, as to its meaning and effect will not be considered." Syllabus pt. 3, *Kanawha Banking & Tr. Co. v. Gilbert*, 46 S.E.2d 225 (W. Va. 1947).

"The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syllabus pt. 4, *Dan's Carworld*, 677 S.E.2d 914 (quoting Syllabus pt. 1, in part, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of Am.*, 162 S.E.2d 189 (W. Va. 1968)). Under West Virginia law, "[a] contract is considered ambiguous if it is 'reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of

construction.'" *Jessee v. Aycoth*, 503 S.E.2d 528, 531 (W. Va. 1998) (per curiam)[5] (quoting *Williams v. Precision Coil Inc.*, 459 S.E.2d 329, 324 n.23 (W. Va. 1995)). Ambiguity also implicates the intent of the parties: "Ambiguity in a statute or other instrument consists of susceptibility of two or more meanings and uncertainty as to which was intended." *Id.* (quoting Syllabus pt. 13, *State v. Harden*, 58 S.E. 715 (W. Va. 1907)). "Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent." *Id.* (quoting *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 716 n.7 (W. Va. 1996)).

      b.    <u>Terms of the Note and Deed of Trust</u>

    The Court first looks to the Note's definitions regarding types of payments the Tedericks can make to pay off their loan. The Note discusses "Payments" in paragraph 3:

> (A) Time and Place of Payments
> I will pay principal and interest by making a payment every month.
> I will make my monthly payment on the first day of each month beginning on May 1, 2004.
> I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. . . .
>
> (B) Amount of Monthly Payments
> A monthly payment will be in the amount of U.S. $ 875.36.

Note ¶ 3. In short, "monthly payment[s]" contain principal, interest, and "any other charges" owed under the Note.[6] *Id.*

---

[5] The Supreme Court of Appeals of West Virginia has clarified that its per curiam opinions have precedential value and may be cited in support of a legal proposition, contrary to footnote one of *Jessee*. *See* Syllabus pts. 3–4, *Walker v. Doe*, 558 S.E.2d 290 (W. Va. 2001); *State v. McKinley*, 764 S.E.2d 303, 311 (W. Va. 2014). *Contra Jessee*, 503 S.E.2d at 530 n.1.

[6] The Note contemplates "late charges" that may be paid separately, but the Court interprets Paragraph 3 to

The Note next discusses "Prepayments" in paragraph 4:

> I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
>
> . . . The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note . . . .

*Id.* ¶ 4. In sum, Prepayments contain "Principal only." *Id.* The Note Holder "may" first apply the Prepayment to "unpaid interest on the Prepayment amount," but ultimately "will use [the] Prepayment[] to reduce the amount of Principal" owed. *Id.*

The Deed of Trust explains how to apply various payments to the loan:

> Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
> . . .
> Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Deed of Trust § 2. Here, the Deed of Trust distinguishes the methods for applying "all payments" and "[v]oluntary prepayments." "[A]ll payments" are to be applied in the "order of priority" in this section, while voluntary prepayments are to be applied "as described in the Note." *See id.*

The Deed of Trust further defines a "Periodic Payment" as "the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of [the Deed

---

include late charges within "any other charges" owed in a monthly payment to the extent a late charge is not paid separately. Note ¶ 3; *see id.* ¶ 6 (contemplating "prompt[]" payment of late charge if "Note Holder has not received the full amount of any monthly payment" within 15 days of due date).

of Trust]." Deed of Trust ¶ (P). Section 3 defines "Escrow Items," which include taxes, assessments, encumbrances, rents, and insurance premiums. *Id.* § 3.

### 1.    Periodic Payments and Prepayments

The Tedericks argue that the word "amount" in the definition of "Periodic Payment" means that Periodic Payments can include Prepayments, but the Note and Deed of Trust do not support that interpretation. First, the Section 2 of the Deed of Trust refers to "[v]oluntary prepayments" separately from Periodic Payments and "all payments." Deed of Trust § 2. Additionally, "all payments" are "applied to each Periodic Payment" in the order they are due, but "[v]oluntary prepayments" are applied "as described in the Note," which does not discuss Periodic Payments. *Id.*

Second, Prepayments are not "regularly scheduled amount[s] due" because the Tedericks "have the right to make payments of Principal at any time before they are due." Note ¶ 4. Third, Prepayments do not fall under either "amount due" in the definition of "Periodic Payments." Deed of Trust ¶ (P). The first "amount" most clearly refers to "monthly payments" of $875.36 that are "applied as of [their] scheduled due date and [which are] applied to interest before Principal." Note ¶ 3. The second "amount" explicitly refers to Section 3, which covers "Escrow Items." Deed of Trust ¶ (P), § 3. Prepayments are neither a "monthly payment" nor an "Escrow Item." *Id.* § 3; Note ¶¶ 3–4. Therefore, Periodic Payments do not include Prepayments.

### 2.    Form of Prepayment

LoanCare insists that the Tedericks failed to make any Prepayments on their loan because they never submitted a Prepayment in a separate check. Instead, LoanCare argues, the Tedericks' combined payments simply included "overpayments" or some other "remaining amount" on top of their monthly payments. Def.'s Reply at 12, 15.

Nothing in the Note or Deed of Trust clearly requires the Tedericks to make Prepayments in a separate check. Although it is not completely clear that the Tedericks' right to make Prepayments "at any time" means they can make Prepayments "in any manner" or "in combination with any other payment," LoanCare's assertion that "[a] payment of Principal only" means "a payment of Principal and nothing else in a single instrument" is not obviously correct either. *Id.* at 7.

LoanCare argues that the Tedericks' alleged Prepayments constitute "[a]ny remaining amounts" that must be applied in the "order of priority," but the Deed of Trust explicitly says "[v]oluntary prepayments" are applied "as described in the Note." Deed of Trust § 2. Although the broad dictionary definition of "payment" may encompass voluntary prepayments as one form of "money . . . delivered in satisfaction of an obligation," as LoanCare suggests, the Deed of Trust requires that voluntary prepayments be treated differently from "all payments." *Payment*, Black's Law Dictionary (11th ed. 2019); *see* Def.'s Reply at 14. LoanCare's effort to distinguish "prepayments"—alleged with a lower-case "p"—from "Prepayments"—the capitalized, defined term in the Note—is also unconvincing, in part because the Deed of Trust does not capitalize that term. Def.'s Mem Supp. at 8; Def.'s Reply at 11–13. Reading the Note and Deed of Trust together and in their natural sense, it is reasonable to conclude that voluntary prepayments under the Deed of Trust are the same as Prepayments in the Note. Deed of Trust § 2; Note. ¶ 4.

For the foregoing reasons, the Tedericks offer a reasonable interpretation of their rights under the Note, and LoanCare's interpretation is not "plain and unambiguous[ly]" correct. Def.'s Mem. Supp. at 10. Therefore, the Tedericks plausibly allege that they properly submitted Prepayments—not overpayments or something else—along with their monthly payments.

3.    Order of applying monthly payments and Prepayments

The Tedericks allege that LoanCare and other servicers incorrectly applied monthly payments before applying an accompanying Prepayment. SAC ¶¶ 22, 27. Neither the Note nor the Deed of Trust clearly states which should be applied first. LoanCare's argument that it must apply a Prepayment after applying the monthly payment is not "plain and unambiguous[ly]" correct because monthly payments and Prepayments are subject to different application methods. Def.'s Mem. Supp. at 10–11; *see* Deed of Trust § 2. The Tedericks' right to submit Prepayments "at any time" also does not answer the question of when, or in what order, LoanCare should apply a Prepayment and a monthly payment. Note ¶ 4. Therefore, the Note and Deed of Trust are ambiguous in this regard, and the Court may look to "facts extrinsic to the language of the contract document[s]" to determine whether the ambiguity is resolved elsewhere. *Jessee*, 503 S.E.2d at 531.

c.    Fannie Mae Servicing Guidelines

LoanCare argues that the applicable portion of Guideline F-1-09 that instructs servicers on "Processing a Curtailment"—or processing a Prepayment[7]—indicates that the Tedericks must make Prepayments separately from monthly payments. The relevant portion of Guideline F-1-09 appears as follows:

---

[7] The Tedericks allege that the Guidelines term "curtailment" means the same thing as a "Prepayment" under the Note and Deed of Trust. *See* SAC ¶ 16. LoanCare defines "curtailment" as "a payment of an extra amount towards a mortgage because when you pay extra on your mortgage, you shorten or curtail the length of your loan." Def.'s Mem. Supp. at 3 n.3. LoanCare considers curtailments different than Prepayments because it argues that a Prepayment requires a separate check. *Id.* at 3–4; Def.'s Reply at 6–7. LoanCare provides no source for this definition, and it is not clear that Prepayments may only be made in a separate check rather than in combined payments. Construing the alleged facts in the Tedericks' favor, the Court accepts at this stage that a "curtailment" is the same as a "Prepayment."

---

**Processing a Curtailment**

If the borrower includes a curtailment with his or her monthly payment when the mortgage loan is current, the servicer must apply monthly payments in the order described in the following table, in accordance with *Processing Additional Principal Payments for Current Mortgage Loans* in C-1.2-01, Processing Additional Principal Payments.

| When the borrower submits a curtailment... | The servicer must... |
| --- | --- |

---

. . .

| When the borrower submits a curtailment... | The servicer must... |
| --- | --- |
| with the scheduled monthly payment | apply the scheduled monthly payment first, then apply the curtailment. |
| at any other time of the month, separately | apply the curtailment first, then apply the next scheduled monthly payment. |

SAC Ex. C at 1–2. LoanCare argues that because the Tedericks always submitted their Prepayments "with the scheduled monthly payment" in their combined payments, LoanCare properly applied the monthly payment first before applying the Prepayment. Def.'s Mem. Supp. at 13.

The Tedericks counter that Guideline C-1.2-01 requires LoanCare to "immediately accept and apply an additional principal payment (referred to as a principal curtailment) identified by the borrower as such for a current mortgage loan." SAC ¶ 18; SAC Ex. D at 7; Pls.' Resp. Opp'n at 21. Reading this requirement alongside their right to make Prepayments "at any time," the Tedericks argue that LoanCare was required to immediately apply their Prepayments to principal before applying the monthly payment, regardless of whether they submitted the Prepayments separately or via combined payments. Pls.' Resp. Opp'n at 21.

These Guideline provisions do not resolve the ambiguity in the Note and Deed of Trust in LoanCare's favor, but instead confirm that the Tedericks' interpretation of those instruments is

16

reasonable. First, the Guidelines do not unambiguously support LoanCare's argument that Prepayments require a separate check. Guideline F-1-09 does not clearly distinguish the order in which to apply combined payments versus separate Prepayments and monthly payments. That Guideline assumes that Prepayments made "with the scheduled monthly payment" are made at a certain time of the month, as opposed to "any other time of the month." Guideline F-1-09 also assumes that Prepayments made at some "other time of the month" are submitted "separately" from a monthly payment. Yet it does not explain how to apply a Prepayment submitted "with the scheduled monthly payment" but "at any other time of the month," which the Tedericks allege they did. Nor does it explain how to apply a Prepayment submitted in a "separate[]" instrument at the same time as the scheduled monthly payment. Guideline F-1-09 is also unclear whether the word "separately" applies to the form or timing of the Prepayment—i.e., whether a servicer should "first" apply curtailments made via a separate check or curtailments made early in the month, or both. Either way, the question remains how to apply the Tedericks' Prepayments that were submitted in a combined payment at some "other time of the month."

Second, because Guidelines C-1.2-01 and F-1-09 cross reference one another, it is reasonable to read these provisions in harmony and conclude that LoanCare must "immediately accept and apply" the Tedericks' Prepayments made via combined payment.[8] SAC Ex. D at 7. Therefore, it follows that when the Tedericks made combined payments, LoanCare should have first applied the "[v]oluntary prepayment . . . to any prepayment charges and then as described in the Note," and thereafter applied the scheduled monthly payment pursuant to the "order of priority" in the Deed of Trust. Deed of Trust § 2; *see* SAC Ex. D at 7.

---

[8] Guideline C-1.2-01's instruction that lenders must apply curtailments "identified by the borrower as such" is also consistent with the Note's instruction that borrowers must give written notice of a Prepayment. SAC Ex. D at 7; Note ¶ 4.

In sum, the Guidelines support the Tedericks' reasonable interpretation of the Note and Deed of Trust, and they do not resolve any ambiguity such that LoanCare's interpretation of those instruments is "plain and unambiguous[ly] correct." Def.'s Mem. Supp. at 10. The Tedericks therefore plausibly allege that LoanCare misapplied their combined payments.

### ii.     Reliance on Fannie Mae Servicing Guidelines to State a Claim

The Tedericks allege that LoanCare's method of applying combined payments violated the Fannie Mae Guidelines. SAC ¶¶ 16–23. LoanCare contests that as a matter of law, the Tedericks cannot base a claim on an alleged Guidelines violation because they have no private right of action to enforce the Guidelines. Def.'s Mem. Supp. at 11–12. LoanCare points to several cases where plaintiffs were prevented from enforcing the Fannie Mae Guidelines or similar guidelines. *See id.* For example, in *Wade v. Chase Bank USA, North America*, No. 2:12-cv-3565-RMG, 2014 WL 12538883, at *5 (D.S.C. Jan. 9, 2014), Wade alleged that his lender, Chase Bank, was negligent for failing to pursue a claim under Wade's property insurance policy after a fire destroyed her home. Chase Bank contended that it had no duty to pursue an insurance claim, and both parties acknowledged that the mortgage contracts imposed no such duty. *Id.* Wade instead argued that the Fannie Mae Servicing Guide and Chase Bank's conduct created a fiduciary duty to Wade. *Id.*

The Court rejected Wade's reliance on the Guidelines to state a negligence claim: "The federal courts have uniformly concluded, to the extent that the [Fannie Mae] and Freddie Mac servicing guidelines can be read as creating enforceable contractual duties, that borrowers are neither parties nor third-party beneficiaries entitled to enforce the servicing guidelines." *Id.* (quoting *McKenzie v. Wells Fargo Bank, N.A.*, 931 F. Supp. 2d 1028, 1044 (N.D. Cal. 2013)). Wade also failed to cite any authority indicating that "the [Fannie Mae] Servicing Guide creates a duty to mortgagors." *Id.*

18

Other federal courts have similarly found that the Fannie Mae Guidelines do not create duties enforceable through actions for breach of contract or conversion, including when borrowers claim rights as third-party beneficiaries of the Guidelines. *McKensie*, 931 F.Supp.2d at 1044, 1047 (rejecting breach of contract and conversion claims based on alleged Guidelines violations); *Rains v. Chase Bank USA, N.A.*, No. 2:12-cv-3565-RMG, 2014 WL 12538163, at *5 (D.S.C. Mar. 21, 2024) (making same findings as in *Wade* regarding same plaintiff and different lender), *aff'd sub nom. Wade v. Chase Bank, N.A.*, 583 Fed. App'x 291 (4th Cir. 2014); *Coulibaly v. J.P. Morgan Chase Bank, N.A.*, No. DKC 10–3517, 2011 WL 3476994, at *15 (D. Md. Aug. 8, 2011) (noting the "parties recognize that [the Guidelines are] not part of any contract between the parties" and plaintiff did not allege any contractual duties arising from them), *aff'd* 526 Fed. App'x 255 (4th Cir. 2013); *cf. Condel v. Bank of Am., N.A.*, No. 3:12CV212–HEH, 2012 WL 2673167, at *6 (E.D. Va. July 5, 2012) (holding that a lender's violation of federal Home Affordable Modification Program guidelines does not create private right of action for borrowers). The Tedericks do not respond to LoanCare's argument and do not identify authority suggesting they can state a claim for Guideline violations. They simply note that because the Note and Deed of Trust are Fannie Mae and Freddie Mac "Uniform Instruments," the Fannie Mae Guidelines provide "helpful context" to understand the Note and Deed of Trust. Pls.' Resp. Opp'n at 20.

The Court is persuaded that the Tedericks cannot claim a right of action in the Guidelines themselves. The Tedericks identify nothing in the Note, Deed of Trust, Guidelines, or other authority suggesting the Guidelines impose enforceable duties on any servicer or grant them enforceable rights. Therefore, the Court must determine whether the Tedericks' statutory and conversion claims arise from the Guidelines or from an enforceable right of action.[9]

---

[9] Because the Court dismisses the Tedericks' unamended claim of unjust enrichment in Count II below, the Court does not analyze that claim here.

### a.   Count I: WVCCPA Claims

The WVCCPA expressly provides consumers a private right of action to enforce violations of its terms. W. Va. Code § 46A-5-101; *see Delebreau v. Bayview Loan Servicing, LLC*, 770 F. Supp. 2d 813, 819 (S.D. W. Va. 2011); *In re David*, 612 B.R. 349, 368 (Bankr. N.D. W. Va. 2020). In addition, the Supreme Court of Appeals of West Virginia has indicated that the purpose of the WVCCPA "is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (W. Va. 1995). Therefore, the WVCCPA provides the Tedericks an avenue for relief based on alleged Guideline violations, even though the Guidelines themselves do not create an enforceable right of action.

### b.   Count III: Conversion

In Count III, the Tedericks claim that LoanCare committed the tort of conversion. In West Virginia, "conversion is any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights." *Hinkle Oil & Gas, Inc. v. Bowles Rice McDavid Graff & Love LLP*, 617 F. Supp. 2d 447, 453 (W.D. Va. 2008) (citing *Rodgers v. Rodgers*, 399 S.E.2d 664, 677 (W. Va. 1990)); *see Miami Coal Co. v. Hudson*, 332 S.E.2d 114, 121 (W. Va. 1985). Conversion can be proven in three ways: "(1) by a tortious taking; (2) by any use or appropriation to the use of the defendant indicating a claim of right in opposition to the rights of the owner; or (3) by a refusal to give up the possession to the owner on demand." *Hinkle Oil & Gas*, 617 F. Supp. 2d at 453 (citing *Shamblin's Ready Mix, Inc. v. Eaton Corp.*, No. 86-1114, 1987 WL 37511 (4th Cir. 1987)); *see Haines v. Cochran Bros.*, 26 W. Va. 719, 723–24 (1885). A plaintiff need only plead facts sufficient to plausibly claim one of these methods of proof, but in all cases a plaintiff must

have "title or right of possession" to the property. *Thompson Dev., Inc. v. Kroger Co.*, 413 S.E.2d 137, 142 (W. Va. 1991) (quoting Syllabus, *Kisner v. Commercial Credit Co.* 174 S.E. 330 (W. Va. 1934)); *see Haines*, 26 W. Va. at 723.

In short, to state a claim for conversion, the Tedericks must identify a right or duty that LoanCare violated. But as explained above, the Note and Deed of Trust do not give the Tedericks any rights. The Tedericks allege no contractual relationship with LoanCare, and both parties have conceded that no contract exists between them. *See* Order on First Motion to Dismiss at 31. Thus, the Guidelines are the only possible source of a "right of possession" that the Tedericks allege. But because the Guidelines do not give the Tedericks an enforceable right, the Tedericks cannot state a claim for conversion. *See McKensie*, 931 F.Supp.2d at 1044, 1047 (dismissing conversion claim based on alleged violations of servicing guidelines). Count III is therefore DISMISSED.

### iii.   Sufficiency of fraud claim under Count I

LoanCare attacks the Tedericks' fraud-based WVCCPA claims in Count I for failing to satisfy the Rule 9(b) pleading standard. Def.'s Mem. Supp. at 13–19. First, LoanCare argues the Tedericks do not identify any misrepresentations made to them or any individuals who made a misrepresentation. *Id.* at 13–14. LoanCare argues that the phone call between Mrs. Tederick and "Tiffany," a LoanCare customer service representative, involved no misrepresentations and did not address the payment application issue. *Id.* at 14–15; *see* Second Tharpe Decl. at 3–8, ECF No. 34. Second, LoanCare contests that the alleged payment misapplications are simply accounting issues and argues that billing statements cannot amount to "false representations" under West Virginia Code § 46A-2-127. Def.'s Mem. Supp. at 17–18; Def.'s Reply at 18–19.

The Tedericks argue that Rule 9(b) does not apply to their statutory claims, despite the Court's prior determination that it does. Pls.' Resp. Opp'n at 8–9; *see* ECF No. 23–24.

21

Alternatively, the Tedericks assert that their Second Amended Complaint adequately pleads the "who, what, when, where, and how" of fraud. Pls.' Resp. Opp'n at 10–11. In general, the Tedericks characterize the issue as a "long-running *billing* dispute" and a "billing/accounting problem," meaning "misrepresentations may be nothing more than numbers." *Id.* The Tedericks allege the dates their monthly payments were due and received, the amounts of the Prepayments that LoanCare misapplied, and information about their phone call with Tiffany. *Id.*; *see* SAC ¶ 25–28. The Tedericks thus argue that LoanCare has sufficient information and notice of the relevant conduct to defend itself against fraud claims. Pls.' Resp. Opp'n at 10–11.

The heightened pleading standard of Rule 9(b) applies to "allegation[s] that [have] the substance of fraud," and not simply to "causes of action or elements of fraud." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008). The Court looks "beyond each [claim's] label to its substance in order to ascertain if it actually sounds in fraud." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 670 (4th Cir. 2018) (citing *Cozzarelli*, 549 F.3d at 629). A "conclusory disclaimer" or "superficial label" will not suffice to escape Rule 9(b) where the substance of the claim sounds in fraud. *Cozzarelli*, 549 F.3d at 629.

The Court has no trouble finding again that the Tedericks' claim under West Virginia Code § 46A-2-127 sounds in fraud.[10] *See* Order on First Motion to Dismiss at 23–24; *Moore v. RoundPoint Mortgage Servicing Corp.*, No. 2:18-cv-01222, 2018 WL 4964362, at *3 (S.D. W. Va. Oct. 15, 2018). Even though the Tedericks have simplified Count I to avoid explicitly alleging that LoanCare made "false statement[s]" or engaged in a "fraudulent . . . [or] deceptive act or

---

[10] Section 46A-2-127 provides, in part: "No debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers. Without limiting the general application of the foregoing, the following conduct is deemed to violate this section: . . . (d) Any false representation or implication of the character, extent or amount of a claim against a consumer, or of its status in any legal proceeding[.]"

practice," the nature of their claim has not changed. *Compare* SAC ¶ 44, *with* Compl. ¶ 42, ECF No. 1. To the extent the Tedericks argue that LoanCare violated § 46A-2-128 by using "fraudulent, deceptive or misleading representation[s] or means" to collect a debt or information, that claim also sounds in fraud.[11] SAC ¶ 67(c); Order on First Motion to Dismiss at 25. The Court will first evaluate the Tedericks' Second Amended Complaint and its attachments before addressing LoanCare's exhibits.

a.   The Tedericks' Facial Pleadings

The core of the Tedericks' fraud claim lies in the eighteen allegedly fraudulent monthly statements that LoanCare sent to the Tedericks after April 19, 2019, and the September 14, 2020, payoff statement that LoanCare provided. SAC ¶¶ 40–45. LoanCare cites two cases to argue that monthly billing statements cannot constitute false statements or form the basis of fraudulent, misleading, or deceptive conduct as a matter of law. *See* Def.'s Mem. Supp. at 17–19; Def.'s Reply at 19.

In *Rice v. Green Tree Servicing, LLC*, No. 3:14-CV-93, 2015 WL 5443708 (N.D. W. Va. Sept. 15, 2015), Rice's loan contract required him to purchase private mortgage insurance ("PMI") and make PMI payments to Green Tree Servicing, LLC ("Green Tree"). *Rice*, 2015 WL 5443708, at *1–*3. Rice sued Green Tree under § 46A-2-127 of the WVCCPA, alleging that Green Tree sent him monthly billing statements that improperly included a PMI premium as money due on his loan. *Id.* at *11. Green Tree argued that it included PMI premiums in the monthly billing statements in a good faith effort to comply with the Homeowners Protection Act ("HPA"). *Id.* Although the

---

[11] Section 46A-2-128 provides, in part: "No debt collector may use unfair or unconscionable means to collect or attempt to collect any claim." LoanCare does not raise a Rule 9(b) challenge to Plaintiffs' claim under § 46A-2-128 for unfair or unconscionable conduct, and the Tedericks sufficiently state a claim in that regard. SAC ¶¶ 32–37, 46–48; Order on First Motion to Dismiss at 25–26; *see also Moore*, 2018 WL 4964362, at *3 (finding Rule 9(b) does not apply to claim of unfair or unconscionable conduct under W. Va. Code § 46A-2-128).

court held that Green Tree incorrectly interpreted the HPA, it held the charges "did not amount to a 'false representation'" under § 46A-2-127(d) because Green Tree included them "in an effort to comply with federal and state law." *Id.* at *12. Therefore, Green Tree's conduct was not fraudulent, deceptive, or misleading. *Id.*

The facts and holding in *Perrine v. Branch Banking & Trust Co.*, No. 2:17-cv-70(Bailey), 2018 WL 11372226 (N.D. W. Va. Sept. 25, 2018), are very similar. Perrine and his co-plaintiff (collectively, "Perrine") made payments on their loan to Branch Banking & Trust Co. ("BB&T") containing amounts for their monthly mortgage payment and a payment protection plan. *Perrine*, 2018 WL 11372226, at *1. Perrine alleged that instead of applying the payment protection amounts to the relevant plan, BB&T erroneously applied those amounts to principal. *Id.* at *1, *5. Perrine argued that this error meant every billing statement or communication from BB&T allegedly violated § 46A-2-127(d) because they misrepresented the "character, extent or amount" of the debt Perrine owed. *Id.* at *5; § 46A-2-127(d). BB&T disagreed that the monthly billing statements were fraudulent and argued the Truth in Lending Act ("TILA") required it to send the statements. *Id.* The court held that BB&T's billing statements were not "false representations" under § 46A-2-127 because it sent them "in an effort to comply with federal and state law." *Id.* Even if the statements were incorrect, BB&T's conduct "was not fraudulent deceptive, or misleading." *Id.*

The Tedericks do not directly respond to LoanCare's argument and do not address *Rice* or *Perrine*. "While courts in this and other Circuits have found that certain claims and defenses can be abandoned or waived for failure to pursue them in the pleadings, the Court does not find it appropriate to do so here." *Reed v. Fairfax Cnty., Va.*, No. 1:18-cv-1454, 2020 WL 252992, at *5 (E.D. Va. Jan. 15, 2020) (collecting cases). *Rice* and *Perrine* were decided on summary judgment and rested on facts gathered through discovery, including the facts surrounding their legal

24

obligations and good faith efforts to comply with the law. *See Rice*, 2015 WL 5443708, at *11–12; *Perrine*, 2018 WL 11372226, at *5. LoanCare does not claim it has a legal obligation to send monthly billing statements, and the Court must construe all facts in favor of the Tedericks at this stage. *See Erickson*, 551 U.S. at 94. Although the Tedericks' silence regarding *Rice* and *Perrine* does not help their claims, the Court declines to fashion a new rule that forecloses parties from stating a claim under the WVCCPA based on allegedly false billing statements.

In this case, the Tedericks have pled facts plausibly alleging that the monthly statements are a "false representation . . . of the character, extent or amount of a claim against" them. W. Va. Code § 46A-2-127(d). The Second Amended Complaint sufficiently identifies the allegedly fraudulent billing statements, the dates on which LoanCare sent those statements, and how LoanCare allegedly misapplied their combined payments. SAC ¶¶ 25, 28–29.

Additionally, the Court finds it prudent to "hesitate to dismiss [the] complaint under Rule 9(b)" because LoanCare appears clearly "aware of the particular circumstances for which [it] will have to prepare a defense at trial" and already "has substantial prediscovery evidence of those facts." *Harrison I*, 176 F.3d at 784. The Tedericks have supplemented their complaint with "further details, as possible," meaning the circumstances surrounding the Tedericks' fraud claim are limited. Pls.' Resp. Opp'n at 11. LoanCare has demonstrated that it has meritorious defenses regarding the monthly statements and payment application process. LoanCare also has ample prediscovery evidence of the Tedericks' payments and the phone call with Tiffany, as demonstrated by the Account History and phone call recording LoanCare submits as exhibits. Second Tharpe Decl. at 3–8; Third Tharpe Decl. at 4–7, ECF No. 38-1. LoanCare also produced these materials to the Tedericks in prior litigation. Second Tharpe Decl. ¶ 3 (citing *Tederick v. LoanCare, LLC*, No. 3:21-CV-144 (N.D. W. Va.)); Third Tharpe Decl. ¶ 3 (same).

b.   LoanCare's Exhibits Containing the Call Transcript and Account History

LoanCare argues that the call recording, call transcript, and Account History negate the Tedericks' ability to state a claim of fraud. LoanCare urges the Court to consider these documents at the motion to dismiss stage because it argues they are "integral" to the Second Amended Complaint. Def.'s Mem. Supp. at 14 n.6; Def.'s Reply at 9 & n.1. The Tedericks disagree that the call recording and transcript are integral but do not contest the issue in detail. Pls.' Resp. Opp'n at 11. LoanCare submitted the Account History with its Reply, meaning the Tedericks did not have an opportunity in their Response to address the Account History. *See* Third Tharpe Decl.

"Courts are limited to considering the sufficiency of the allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). If matters "outside the pleadings are presented to and not excluded by the court [when considering a Rule 12(b)(6) motion], the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d); *see also Megaro*, 66 F.4th at 157. "[I]t is not appropriate for the court to convert a motion to dismiss into a motion for summary judgment 'when the parties have not had an opportunity to conduct reasonable discovery.'" *Megaro*, 66 F.4th at 157 (quoting *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015)). Despite this rule, a court may "properly take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Id.* at 157 (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

Courts may also consider documents attached to a motion to dismiss that are "integral to and explicitly relied on in the complaint and [where] the plaintiffs do not challenge [their] authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)

26

(citation omitted); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016). The Fourth Circuit has favorably cited the Third Circuit's explanation of the rationale for this exception:

> [T]he primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Am. Chiropractic*, 367 F.3d at 234 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (internal quotation marks and alterations omitted).

The Court does not find the phone call recording, call transcript, or Account History "integral" to the Tedericks' complaint. The core of the Tedericks' fraud claim rests on the eighteen monthly billing statements, not the phone call, meaning the Second Amended Complaint does not "rel[y] heavily upon [the call recording's] terms and effect" when stating a claim under § 46A-2-127. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Goines*, 822 F.3d at 166. The Second Amended Complaint does not "extract an isolated statement" from the call, and examining the "full context of the document" does not make it "clear" that any particular statement was not fraudulent, misleading, or deceptive. *Am. Chiropractic*, 367 F.3d at 234. Instead, the parties heavily dispute the phone call's significance and the meaning of Ms. Tederick's and Tiffany's statements. *See* Def.'s Mem. Supp. at 14–16; Pls.' Resp. Opp'n at 11–12; Def.'s Reply at 19–20. Therefore, even if the Court considered the phone call, it does not clearly demonstrate that the Tedericks cannot state a fraud claim.

LoanCare provides the Accounting History to illustrate its interpretation of how to apply combined payments under the Note, Deed of Trust, and Guidelines. *See* Third Tharpe Decl. ¶¶ 5–

6. Yet the Tedericks validly dispute LoanCare's interpretation, and the Account History has no "independent legal significance." *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015); *see also Goines*, 822 F.3d at 166. Rather, the Account History is purely of factual significance, and the Tedericks need not rely on it to allege that LoanCare misapplied their combined payments. The fact that LoanCare included the Account History on reply also weighs against considering it at this stage.

For the foregoing reasons, the Tedericks plead sufficient facts to state a claim under §§ 46A-2-127 and 46A-2-128 in Count I.

## C.    LoanCare's Request to Dismiss Count II

In Count II, the Tedericks allege that LoanCare benefited from unjust enrichment at their expense by misapplying their Prepayments and charging undue interest. SAC ¶¶ 49–55. The Court dismissed this claim upon LoanCare's first motion to dismiss, and both parties agree that the Tedericks did not amend it in the Second Amended Complaint. Def.'s Mem. Supp. at 19; Pls.' Resp. Opp'n at 21–22; *see* Order on First Motion to Dismiss at 29, 38. The Tedericks aver that they only intended to preserve the claim for appeal and presume the Court will dismiss it. *See* Pls.' Resp. Opp'n at 21–22.

For the reasons stated in the Court's Order issued on October 2, 2023, Count II is DISMISSED. *See* Order on First Motion to Dismiss at 26–29.

## IV.    CONCLUSION

For the foregoing reasons, LoanCare's Motion to Dismiss is **GRANTED in part and DENIED in part**. The Motion to Dismiss Counts II (Unjust Enrichment) and III (Conversion) is GRANTED. The Motion to Dismiss Count I (WVCCPA Claims) is DENIED. The Court **DIRECTS** the Clerk to provide a copy of this Memorandum Opinion and Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
March 21 , 2024

Raymond A. Jackson
United States District Judge